May I please the court? My name is John Matropoulos. I represent the appellants here. I would like to reserve five minutes for rebuttal. This case concerns an act of Congress impacting a specifically chosen minority group and what that minority group can expect to receive by way of constitutional protections from the Constitution. There are two interests at play and at tension here. One is the interest in policing alleged misdemeanors committed by a specific racial group, that is, nonmember Indians. And the penalty that can be levied upon someone convicted of such misdemeanor by a tribal court is one year in tribal jail and up to $5,000 fine. The other interest that is at tension with that is the constitutional interests of that class of offenders, which is nonmember Indians, that is, people who are Indians by race and ethnicity but are not members of the tribe that wishes to prosecute them criminally. Those nonmembers, as citizens of the United States, can expect all the protections of the United States Constitution. Specifically in this case, we have alleged that the act of Congress, the 1990 amendments cited in the briefs, violate the fundamental right to equal protection under the Fifth Amendment and due process under the Fifth Amendment. Because in enacting those amendments, Congress specifically narrowed or selected that group of U.S. citizens for prosecution by sovereigns that are not bound by the Constitution and that exclude them from participation in its political processes because of their race or ethnicity. Now, as the panel, I think, likely knows, this case has been here before. I argued here in March 2001. It was remanded to Judge Malloy in Montana, who made a finding specifically in response to this court's memorandum that the categorization made by Congress is political and not racial. And that goes to the equal protection claim brought here. And I would like to address that first and then move on to the due process claim. Now, there are 4.1 million citizens of the United States who are Indians. 1.7 of them are enrolled Indians in one of the 556 tribes in the United States. The decision in this case, assuming it's applied nationwide, which it would not be. It's Ninth Circuit. But the decision in this and the other cases that will clarify this point will affect at least 1.7 million. The figure 4.1 million comes from the United States Census. That includes enrolled Indians and people who are Indian by race and have stated that they have an affiliation with the tribe. But they may not be enrolled or they may not be enrolled with that tribe on whose reservation they live. When you say affiliation, you mean they are recognized by the tribe as being tribal members. For example, they receive services, et cetera, et cetera. Or they're just people living out there who say, well, I have Indian blood and I like the fact. The census is sort of self-reporting, so it's hard to tell. You're just going by census data. Is that it? That's correct, Your Honor. And so I'm sure there's some people out there in that 4.1 million who understood the question, do you have an affiliation with the tribe differently than other people? I can't tell you that all of them are recognized by a tribe as a tribal member. Right. Like somebody might say, I'm French, but they've lived in, their family's been in this country for three generations. And you say, what are you? They say, well, I'm French. But that doesn't mean they're French citizens. Well, I think the response to the question and the data used by the census implies at least more than that. Are there more Indians yet, according to the census? I don't know. That's just a gross number that could say we're Indian, is that right? Right, in the 2000 census. So some of those may be really tribal members, though not enrolled, and others might be folks that just aren't associated at all, really. Is that right? I think all tribal members are enrolled, Your Honor. Well, you know, we have a number of cases that say there are different ways of being essentially, for all practical purposes, a member of a tribe. You might be enrolled or you might be living on that tribe's reservation. You might have getting its services, et cetera, et cetera. I think you know the case I'm talking about. Well, I do understand. But enrollment is not the only way you can be a political Indian. Well, enrollment is not the only way you can be an Indian, but you have to be by race an Indian. Oh, sure. Now, an Indian who, let's take a Blackfeet Indian in Montana who lives on the Flathead Reservation, but who is enrolled in the Blackfeet tribe, that person isn't a Flathead tribal member, even though he or she may receive benefits there on the Flathead Reservation. I'm sorry. What was the number you gave for the enrolled Indians? Enrolled Indians, according to the 2000 census, is 1.7 million people. The key fact that I think needs to be considered here in the Equal Protection Analysis is that every person who is swept within the scope of tribal criminal jurisdiction by the 1990 amendments is an American Indian by their race. The United States has argued and the tribes have argued that this is a political category, which you will note from the briefs I've strenuously disputed. But that may be a red herring. In fact, I think it is a red herring because the one immutable characteristic of being an Indian is the person's race. Now, that's been established since U.S. v. Rogers in 1846, a case not cited by either the United States here or the tribes. No, but that's not the basis on which the 1990 amendment operates. It only operates with respect to what you said, enrolled Indians. I must respectfully disagree, Your Honor. The statute actually says, 25 U.S.C. 1301, actually says all Indians. It's only Indians defined, though. And then it refers, in terms of defining what it means by all Indians, it refers to 18 U.S. Cases under 18 U.S.C. 1153. And as Judge Fernandez noted, there's a lot of cases throughout the country under that section. The one immutable characteristic, according to the United States Supreme Court in Rogers, and ever since then, is the person's race. I know that my question is, how is Indian defined in the statute? It is not, Your Honor. It is not defined, in fact, as I understand it, in any statute. It says an Indian under Section 1153 Title 18. Correct. That's the definition, isn't it? No, it is not. It's a criminal section. I believe it's called the Major Crimes Act. That's correct. And it, too, looks to a test of, first, is the person racially an Indian? And, second, do they have some ñ are they enrolled in a tribe? Do they have some affiliation with the tribe? There is no actual definition, I don't believe, in any U.S. statute as to who an Indian is. Now, the point of focusing you on the fact that every person affected by the 1990 amendments to the Indian Civil Rights Act is an Indian is to point out that strict scrutiny is the appropriate level of scrutiny for this act. And the United States Supreme Court in Adirondack said all such classifications have to be subject to strict scrutiny. You would say that even as to enrolled members in a particular tribe? I would, Your Honor, if the statute were to specify enrolled members. So is this Blackfeet, the Blackfeet Tribal Council or court adjudicating cases regarding Blackfeet Indians, you'd say we have to look at strict scrutiny for that? Would be your position. Is that correct? No, it would not, Your Honor. The position is for nonmember Indians. Well, if it's even the Blackfeet, they have their immutable characteristic is it's racial. When you're saying the immutable characteristic is racial, you've got to do. So in the example I gave you, every one of those people immutably has to be racially Indian, correct? So you would say that strict scrutiny applies there? Under an equal protection analysis, I do, Your Honor. But I think the question you're asking me goes to the due process analysis. No, I'm asking a protection question. I'm asking an equal protection question. So if a Blackfeet tribal member says, wait a minute, you can't try me in tribal court for committing this misdemeanor, you're using the only reason you have jurisdiction is racial. No, Your Honor. Under the Supreme Court jurisprudence, the reason they would have jurisdiction is the inherent sovereign jurisdiction of the tribe itself. And that, the Supreme Court has said, remains. That's United States v. Duro, which was the genesis of these 1990 amendments. So the tribe would be using its own inherent jurisdiction, and that wouldn't require any constitutional analysis. But in this case, Congress explicitly reached out to try to get nonmember Indians within a tribe's jurisdiction. And in doing that, Congress, when it takes any action, I believe, has to act in accordance with the Constitution. Your Honor, inherent jurisdiction is sort of funny talk in a way. Are you suggesting that before the treaties and such, tribes could not exercise jurisdiction against people from other tribes that happen to be in their territory? I'm not suggesting anything about that point. I don't know. I believe that I know the U.S. jurisprudence on the issue of inherent sovereignty assumes that that was the case. That the tribes did exercise jurisdiction, civil and criminal, over people within their territory. Right. So. Well, since the tribes have been incorporated into the U.S. We take it away and we give it back when we feel like it. But I suppose Congress could deprive and maybe have tribes actually adjudicating rights among their own members. I don't know whether Congress has done that among, has limited, well, yeah, Congress has limited a tribe's power to adjudicate rights among its own members under the Indian Civil Rights Act. So Congress can always, can take away anything it wants. It could take, it's clearly taking away felony jurisdiction, and it could get it back. But does that make it any less inherent? Well, the Supreme Court in U.S. v. Lohr, I believe, said it doesn't make it less inherent, although I don't think the opinion really got into that metaphysical level of what's inherent sovereignty and what's not. Okay. But the Court, as you know, the concurring justices, and I believe the dissenting justices, pointed out the very constitutional issues that are presented here by this case that are very troubling. And that's, you know, that Indians are just selected out by Congress for reasons that aren't, don't appear to be compelling or to advance a compelling state interest. I'd like to also point out that in a recent case, which I can't pronounce, Cajahuala v. Norton, a panel of this Court with Justice Thomas, which was on the first panel of this case, was very careful to note that while Congress's plenary power over Indian affairs in that case allowed rational basis, level of scrutiny for the Department of Interior decision not to grant federal recognition to Hawaiian indigenous people, that panel said that's not the same as dealing with individuals' rights. And that tracks very closely with what the Supreme Court said in Adirondack, which is the individual and that person's rights has to be looked at and protected. And the Court recently reiterated that in Johnson v. California, when California was arguing for an intermediate level of scrutiny because it was dealing with a prison issue that it thought warranted some racial classification, and the Supreme Court said it doesn't. It's a racial classification. It requires strict scrutiny, requires proof of a compelling state interest, narrow tailoring, and California failed in that instance. And the United States and the tribes have not even attempted, I believe, seriously, to leap that hurdle in this instance. My time is up. I will save about 4 minutes and 50 seconds for rebuttal. Thank you.  Mr. Smith. May it please the Court. Are you dividing the minutes in what proportion? Roughly evenly, Your Honor. So at some point I'll pass the baton to Mr. Hovenkater. Great. I also wanted to express my appreciation to the panel for moving the argument, which was extremely helpful. I'll begin by addressing a question raised by my colleague, Mr. Mitropoulos, which is the number of, the size of the category of non-enrolled Indians under this statute. And I'll point out that it's sort of a hard statistical question. I don't think the Census Bureau was using the same standard as the one this Court has adopted in cases like this. If you look at Attachment C to the U.S. Brief, there was a survey done at the time of the 1990 amendments, and tribes responding to that survey estimated that they had about 5 percent of the reservation population was not enrolled in any tribe. So that's maybe a better approximation of the number, although it's hard to be sure. Turning to the definition of Indian for purposes of these amendments, which was another topic that was raised, the ICRA uses the definition that's applied under 18 U.S.C. 1153. That's a federal common law definition, and this Court talked about it in some detail in the Bruce case. And the way the Court talked about it in Bruce, there's effectively two prongs. There are enrolled tribal members, and then there's a category of people who are de facto members by virtue of having a close relationship with the tribe that's equivalent as a practical matter to membership. People like minor children or other individuals who for whatever reason haven't actually enrolled but are functionally members of the tribe. And we don't think that the existence of this category should affect the equal protection analysis. First of all, because it's a... When you say this category, what do you mean? The functionally equivalent to being enrolled category? Exactly. The affiliated persons category. For one thing, it's a voluntary category. You can disclaim that status if you want to. It's also a category that the Supreme Court noted in Antelope, and that this Court also noted in Keyes. So it's part of the fabric of federal Indian law is the existence of this category, and it's never been thought to change or heighten the standard of equal protection review. Turning to the Kahawaiola case, that case also talked about the Antelope case and it talked about the Mankari case. It seems to really reaffirm this Court's body of case law, saying that it's a rational basis standard when you're dealing with activities in Indian country, the relationship with tribes, as in this case. I thought I would turn to some of the due process questions raised by Morris' brief. Morris raises concerns about the tribes being non-constitutional sovereigns, and as a practical matter, by virtue of the Indian Civil Rights Act, the tribes are subject to the Bill of Rights, especially for purposes of this case. This Court has held that, for example, the Fourth and Fifth Amendment Well, there are one or two provisions that are debatable, but they're actually not at issue in this case. So for purposes of this case, it's identical to the Bill of Rights. The differences come up, for example, in the right to appointed counsel context, and that's a question that could be raised in an as-applied case, and it's possible that a court might conclude that Congress, the history of that provision of ICRA is that at the time ICRA was enacted, tribes only had jurisdiction to impose six-month sentences, and there was no right to counsel at that time in 1968 for terms of incarceration under six months. If a later court, federal court, found that it was necessary to do so, it could be found in the Due Process Clause of ICRA that Congress intended implicitly for there to be a right to counsel, appointed counsel, in certain types of cases. That might be a case-by-case analysis. The analysis, it's really more of a contextual analysis and outside the scope of this case. It could also, in theory The rights are statutory, right? Excuse me, sir? The rights are statutory rights, not the Bill of Rights directly. They are statutory rights, but in a funny sense, in the sense that should Congress try to repeal those rights, there also might be a constitutional challenge to that attempt to repeal those statutory rights. So, and it's arguable that, although the U.S. takes no position on this question, that there would be limitations on the ability of Congress to repeal certain elements of ICRA as applied in certain contexts. So it may be a distinction without a difference, whether it's a statutory right or not. Well, I don't know. I mean, if you can repeal the inherent power of a drive, I don't see how you can't repeal it. That's your statute, I think. Well, Your Honor, to the extent that a court found that there were concerns about the consequences for certain individuals who are subject to tribal jurisdiction, it's possible that those individuals might have a claim as to Congress's ability to effect that repeal. How does that make any difference? I mean, we're sitting here today with the statute that sets out those rights. What difference does it make if they're constitutional rights or statutory rights directly? For a person in this case, none at all. I mean, there is no right to counsel for a $100 traffic ticket. There's no right to a jury trial under federal law for a $100 traffic ticket. No right to a grand jury indictment. But that right has never been incorporated against the States. So, once again, the differences of ICRA are quite narrow. And to the extent the Court might see a constitutional problem, that can be addressed another day in another case. There's really no need for this Court to reach out now to those types of issues. Mr. Morris also talks about the right to vote. That can be analyzed. It can be broken down into two sets of fact patterns. There's questions about the right to vote if someone is passing through Indian Country away from home. And in contexts like that, it's never been thought that there's any problem with being prosecuted by a local government for which you have no right to vote when you happen to be away from home. The second fact pattern where this might come up is if you are resident on a reservation and have an ongoing relationship with the tribe and are concerned about your right to vote there. And there it would seem that you're fully on notice of the voting arrangements in Indian Country, which have obtained since before the time of the framers, which are based on tribal membership. And so you really are not in a position to object. If you are concerned, you can opt out because tribal membership is voluntary. You don't have to remain within the jurisdiction of the tribe. You're probably also likely to be familiar with tribal customs and other circumstances within the tribe. And to the extent that any particular fact pattern might give rise to a problem in connection with this voting arrangements in Indian Country, you've got a habeas remedy, which is the remedy that you'd have for any state court type of concern as well. Mr. Morris talks about in his brief a right to travel hypothetical, which involves an Indian who's traveling to Maine and is subject to the jurisdiction of a tribe far away from home. The first point to make about that hypothetical is that if he committed murder or another major crime, he would likewise be subject to a different jurisdictional rule. That is, the federal framework of Indian law is complicated, and he'd be subject to the Major Crimes Act, and the Supreme Court has upheld that in antelope, that distinction in antelope. And this is really this particular jurisdictional arrangement fills the negative space left by 1152 and 1153, fills the gap left by the Duro decision. The Supreme Court in Washington of the Yakima tribes found that it's permissible for a state to tailor its state laws to fill the negative space left by the Major Crimes Act and the remainder of the framework of federal Indian law, and that's effectively what's going on here. It's a tribal jurisdictional arrangement that responds to and corresponds to the framework of federal Indian law and shouldn't raise any equal protection concerns. I'd also point out that if, on this hypothetical involving an incident in Maine, if Mr. Morris were injured, he'd be entitled to tribal services in that, from that tribe in Maine, unlike a non-Indian. So there are benefits and burdens associated with tribal membership or affiliation, and Mr. Morris must take both of those together. I'll cede the rest of my, I'll pass to Mr. Hovenkater, if there are no questions. Thank you, Mr. Smith. May it please the Court. Good morning. I'm Joel Hovenkater. I'm a staff attorney for the Confederated Salish and Kootenai tribes. Prior to getting into my argument, I wanted to extend my appreciation on behalf of Chairman D. Fred Matt of the tribes for the forum and the opportunity. Thank you. With response to two questions that have been asked. First, Justice Fernandez inquired as to whether or not there was a definition of Indian within the United States Code. There are two that I can think of. One is in the statute that's referred to as the National Indian Forest Resources Management Act, and the second is the National Indian Agricultural Resources Management Act. Within those definitions, the definition of Indian is tied to membership in a federally recognized tribe or a recognized Alaska Native community, I believe. And I can get you those citations, if you wish, in the definitions. Secondly, there's also definitions of Indians in treaties that the United States has entered into. And it's notable that in the Seminole Treaty, at the time that treaty was entered into, in Article 9 of that treaty, it provided for inclusion in the Seminole tribe of persons who were not racially Indian. It recognized that there were people who were freed slaves at the time. They were deemed to be of Negro blood by the parlance of that treaty, and that they would be determined to be members of the Seminole Nation without regard for their racial or national origin. The second question that Justice Fernandez asked had to do with the past practice of the tribes and whether or not they treated nonmember Indians pursuant to their own cultural practice. You'll find in my briefs at page 9 that we address the issue and take a look at the anthropological record and also look at some cultural history as expressed by tribal judges in this case. They've identified that in the past, the Confederated Salish and Kootenai tribes, at least, did include members of other tribes often in their cultural ways historically, and that they were subject to tribally recognized judicial institutions without regard for their tribal membership or national origin. The tribal court continues that tradition today in that it does not ask for the tribal origin of any member that comes before it, but all are treated similarly, simply based upon their membership in a federally recognized tribe. Now, to my argument, my client is a judge with the tribal court. Her name is Wynonna Tanner. In her official capacity, she's attempting to adjudicate a misdemeanor criminal traffic violation with a maximum fine of between $10 and $100 in the tribal court. In attempting to do so, she has been accused by Mr. Morris of operating a forum that is without equal protection or due process of law. In his briefs, Morris analogizes the tribal court and the tribal law to Nazi Germany's Jewish Nuremberg laws, South Africa's apartheid, and southern U.S. state's miscegenation laws. Judge Tanner does not take those accusations lightly. She's concerned by them. Mr. Morris's case, in the eyes of Judge Tanner, is long on hyperbole but short on fact and law. His burden is heavy. You'll note that this is a facial challenge to a United States statute. Accordingly, Morris's burden with a facial challenge pursuant to Supreme Court case law in U.S. v. Salerno is when he challenges his legislative act, of course, this burden is the most difficult challenge to mount successfully since the challenger must establish that under no set of circumstances exists under which the act would be valid. And that's a Supreme Court application under U.S. v. Salerno. Mr. Morris simply can't meet that burden in this case because under the facts of his case, this is a constitutional application. First, the tribes are applying their power pursuant to their retained sovereign authority as was recently affirmed by the Supreme Court in U.S. v. Lara. Second, the distribution scope of that power is subject to the plenary power of Congress and has been distributed here pursuant to the various Indian Crimes Acts found in 18 U.S.C. 1151 through 1153 and the Indian Civil Rights Act of 25 U.S.C. 1301. And then maybe most importantly in this case, the particular jurisdiction in the Flathead Reservation is distributed pursuant to Public Law 280. And most specifically, under that Public Law 280 distribution that was agreed to by the state legislature and executive branches and by the tribal government and by the U.S. executive branch, there is a memorandum of agreement between all those parties of government on Flathead Reservation that defines how jurisdictions to be determined. And I quote from that memorandum of agreement under its field determination section. It states, law enforcement officers will determine the Indian slash non-Indian status of a suspect at the crime scene as soon as possible after providing any emergency law enforcement services and securing public safety for purposes of the agreement. For purposes of the agreement, an Indian is a person who is an enrolled member of a federally recognized tribe. It's very specific. There is no other criteria required. There is no reference to any race-based determination for determining criminal jurisdiction of the tribal court. So in this case, the tribes simply are applying this federally state and tribally approved jurisdiction document against members of federally recognized tribes. Is that agreement part of the record? I'm sorry, Your Honor. I didn't hear you. Is that agreement part of the record? Yes, it is. You'll find it in my, in the tribe's excerpts of record. Okay. That's good enough. I can find it. Item number 12, ER, page 87 is where it begins, Your Honor. So from the Confederated Salish and Kootenai tribal perspective, there is no racial aspect to this case. There is a racial component, however. The racial component is brought to the case by Mr. Morris himself. He, by voluntary affiliation, is a member of the Minnesota Chippewa tribe. The Minnesota Chippewa tribe's constitution requires that a member have a quarter degree of blood quantum in order to retain membership. He's brought that by his own voluntary affiliation to the Flathead Reservation. Conversely, the Confederated Salish and Kootenai tribe's constitution provides for the potential for adoption of persons into the tribe without regard for their racial history or national origin. Similarly, as I noted before, the treaty with the Seminole and the treaty with the Creek provide for similar opportunities for nonracial Indians to be included within the membership of tribes. My perception that the Supreme Court, the U.S. Supreme Court, has also recognized this possibility for nonracial Indians to become citizens of Indian nations in two cases. The first is cited as Alberti v. U.S. at 162 U.S. 499, and the second is No Fire v. U.S. at 164 U.S. 657. Mr. Mitropoulos will probably take issue with those cases because he was not a criminal defendant whose tribal membership was involved at the time, but it was the victim of the tribe whose membership became important because for purposes of those cases, under 25 U.S.C. jurisdiction and 25 U.S.C. 1152, you also have to analyze the victim's membership, and it was the victim's membership that was under scrutiny in those cases. One other thing I wanted to accomplish today was to identify that although Mr. Morris, although he raises a due process argument, he does not advise the court of many of the remedies that are available to Morris. Mr. Morris has significant remedies in this case. He has personal remedies. As noted by Mr. Smith, he could renounce his membership in a federally recognized tribe, and by so doing he would not be subject to any immutable characteristic but could simply leave behind his Indian status for purposes of jurisdiction on the Flathead Reservation. He has judicial remedies. The tribal court has a federally approved criminal procedure and federally approved criminal code. Within it, it has access to a court of appeals. He has federal judicial remedies, as is evidenced today, and may have future federal remedies as applied challenge and certainly has remedies pursuant to 25 U.S.C. 1303 as habeas corpus. He may have state judicial remedies. Because the Flathead Reservation is a public law 280 jurisdiction, it requires that the state concur in the jurisdictional scheme, and he may be able to access the state courts for that challenge. In addition, he has executive remedies. Article 9 of the Treaty with Chippewa provides that he can petition the executive branch of the United States, petition the president when he has troubles with other Indian tribes, and he has significant political remedies. Most notably, he's a member of the Minnesota Chippewa tribe. If he doesn't like their race-based membership determinations, if that's how he deems them to be, he has all of his participatory rights that he could return to the Minnesota Reservation and exercise those. And finally, with the few seconds that I have left, I just want to identify probably the most critical rational basis for proceeding with this, and that's the existence of the tribal court and the integrated scheme that it has for assisting both victims and defendants on Flathead Reservation crimes. I see that I'm out of time. If you hear that, I can continue. If not, I'll sit down. Questions? We appreciate your argument. Thank you. Okay. Dr. Dropos, go ahead, please. I'll get right to the heart of things. First, the renunciation or disenrollment argument is saying that a person can renounce their father, their mother, their grandfather, their grandmother, their family, their history. And it's posed as really an easy thing to do and nothing that should be viewed as impinging upon a person's rights. I think that's, frankly, outrageous. It's not a matter of simply disenrolling because affiliated people also are swept within the scope of this statute. So if you disenroll but you live in the home that you've lived in for 30 years, you're still on the reservation. And, you know, there may be some inquiry as to whether you're still affiliated with the tribe, but the answer would be yes. Second, Mr. Hovenkater spent a lot of time telling you about the CSKT, Confederated Salish and Kootenai Tribe, procedures and what they do. They're all irrelevant. And that was decided by the first panel that had this case. That's the law of this case. The question here is whether Congress violated the Constitution. Whatever protections or procedures the Flathead Tribes put in place mean nothing. Third, I want you to remember all Indians are nonmember Indians. To think that there's not a situation where an enrolled Indian in the United States is never a nonmember would be to believe that they never leave their own reservation. And that is just not the case. Everyone who is an Indian in the United States, whether they're Flathead, Blackfeet, Seminole, probably moves and goes to another reservation. That's why we have this issue in the first place. So all Indians are nonmembers in some circumstance or another. Now, as for the issue of the two fact patterns that Mr. Smith pointed out, he's right. I mean, as I said, Indians travel just like everyone else in this country. I guess I want to point out also, in 1924, Congress removed any question as to whether Indians are citizens of the United States and have all the rights of every other citizen. So they do. But as to these fact patterns, Mr. Morris did live on the Flathead Reservation until he died last June for approximately 18 years. It's not a matter of him just driving through. And yet he had no relationship with that tribe. He was a Chippewa. He grew up or he didn't grow up. He was raising his family there. And he wanted to live in Ronan, Montana. And that's where he lived. And he had every right to live there. And yet their argument is he needs to renounce his membership with the Chippewa tribe and go through whatever else is undefined to make sure that he severs all relations with that tribe in order for him to have his constitutional rights if he's arrested for a misdemeanor in Montana. That's not something that I have to do. I'm not Indian. It's not something that any other citizen of the United States would have to do. And I think it's disingenuous at best to say, well, you can just renounce your membership. It's an easy thing to do. Now, there was a question when the first panel sat that has not been discussed here today that I'd like to discuss a little bit. And that arises from the case of Morton, Veema, and Carey. And I was asked by Judge Pregerson, well, if we ruled in your favor, would that not overturn many of the statutes under the 25 U.S. Code? And the answer has been predicted by the U.S. Supreme Court and by this court in the Kahawaiola case. And that's that, no, it wouldn't overturn many of those statutes. Strict scrutiny applies to all equal protection classifications. But under those, under Adirond and even under Johnson, which recently came out, I think February 23rd, the court left open the possibility that benefits, a classification that benefits identified racial groups, can be upheld and can withstand strict scrutiny. This does not benefit nonmember Indians. It's Orwellian to say that it does. I mean, we're talking about policing misdemeanors here. We're not talking about the nation's security. We're not talking about even any tribe's security. We're talking about misdemeanors. And it does not warrant violating U.S. citizens' rights in order to have that done by a tribe. Thank you. I see my time is up. Thank you very much, sir. Morris v. Tanner shall be submitted. Appreciate the excellent argument on both sides of this very challenging case. So we will proceed with it and give you a decision. Okay. We will now.
judges: Fernandez, Tashima, Gould